UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ELLEN MICHALOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-10-278-B-W |
| | ) | |
| ANNE L. HEAD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER**

Tragically, Ellen Michalowski, M.D. has had a profound prescriptive drug problem. Because of her addiction, the Maine Board of Licensure in Medicine (Board) initiated proceedings to determine whether to impose disciplinary action on her medical license. Concerned that the Board has exhibited bias and will rule against her, Dr. Michalowski seeks a temporary restraining order (TRO) to enjoin the Board from proceeding with a pending adjudicatory hearing. Based on *Younger v. Harris*, 401 U.S. 37 (1971), the Court concludes it must abstain from interfering in an ongoing state administrative proceeding and denies Dr. Michalowski's motion for a TRO.

**I.   STATEMENT OF FACTS**

**A.   The Motion and Response**

On July 7, 2010, Ellen Michalowski, M.D. filed a Complaint against Anne L. Head, Commissioner of the Department of Professional and Financial Regulation of the state of Maine, the Board, and Janet Mills, Attorney General of the state of

Maine. *Compl. for Decl. J. and Injunctive Relief* (Docket # 1) (*Compl.*). The same day Dr. Michalowski filed a motion for TRO. *Mot. for Temporary Restraining Order* (Docket # 4) (*Mot. for TRO*). On July 9, 2010, the state Defendants filed a response. *State Defs.' Obj. to Mot. for Temporary Restraining Order* (Docket # 6) (*State Defs.' Obj.*).

B.   **The Doctor's Complaint**

Dr. Michalowski, a Board Certified specialist in Obstetrics and Gynecology, had practiced medicine in Presque Isle, Maine.[1] Her sad story begins with a skiing accident when she was a teenager in which she tore her medial cartilage. Her therapeutic course has been marked by increasing, unremitting knee pain, multiple unsuccessful surgeries, including a failed total knee replacement, and finally a descent into severe addiction to prescriptive pain killers.

On April 10, 2007, Dr. Michalowski entered into a Consent Agreement with the Board restricting her ability to obtain prescriptive medication to only one approved physician and to one pharmacy, and to limit her primary care physician to one doctor. She also consented to multiple other provisions, including counseling. Between July 2007 and July 2008, however, Dr. Michalowski violated the Consent Agreement by improperly obtaining and abusing prescriptive drugs, including self-prescribing.

Finally, in August, 2008, Dr. Michalowski's ruinously expensive efforts to receive drug abuse treatment bore fruit, and after an intensive course of in-patient therapy at the Sierra Tucson Treatment Center, she became and has remained

---

[1] The Court derived these facts largely from the allegations in Dr. Michalowski's Complaint.

clean and sober. On August 28, 2008, Dr. Michalowski voluntarily agreed to a suspension of her medical license and she has not practiced medicine since. Despite successful completion of the drug abuse therapy program, continued participation in Alcoholics Anonymous and Caduceus (a support group of recovering medical providers), and passing multiple random drug tests, the Board presented Dr. Michalowski with a Second Consent Agreement, which stipulated that she could not practice medicine for four years and during that interval could not reapply for her license. When Dr. Michalowski refused to sign the Second Consent Agreement, the Board prosecuted her for unprofessional conduct between July 2007 and July 2008. The Board held its first hearing on April 13, 2010 with James E. Smith acting as the hearing officer. The evidence was not completed and the hearing was continued to be completed on July 13, 2010.

On July 7, 2010, Dr. Michalowski filed suit, seeking a TRO and preliminary and permanent injunctions against the Board to enjoin it from further adjudicatory hearings against her and seeking a declaratory judgment that its prosecution and enforcement of disciplinary action on her medical license are unlawful and violate due process.[2]

---

[2] The Court first became aware of this controversy on Thursday, July 8 and held a telephone conference with counsel the afternoon of Friday, July 9, 2010. The Court attended to previously scheduled matters during the rest of the day on Friday. The administrative hearing is scheduled to recommence on Tuesday, July 13, 2010. The Court is issuing this Order on Monday, July 12, 2010 in order to address whether the impending hearing can proceed forward. However, the parties, particularly Dr. Michalowski, placed severe time constraints on the Court. The Court has done its level best, but they should appreciate "the temporal constraints under which the district court labored" in arriving at this decision. *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

      The State has not raised laches as a basis for denial of the motion for TRO, and the Court does not rest its decision on Dr. Michalowski's late filing. Here, the Board held the first part of the

3

### C. The State Administrative Regulatory Process and Dr. Michalowski

Dr. Michalowski's case before the Board began on January 11, 2005 when the Board issued her a letter of guidance. On April 10, 2007, the Board and Dr. Michalowski entered into the Consent Agreement. However, subsequently the Board learned from Northern Maine Medical Center that Dr. Michalowski "had been issuing prescriptions to a pharmacy in New Brunswick, Canada for narcotic medication for a fictitious patient, and picking up the narcotic medication herself." *Defs.' Obj.* Attach. 2 *Interim Consent Agreement for Discipline and Modification of Medical Licensure* at 2. On August 26, 2008 and September 9, 2008, Dr. Michalowski and the Board entered into an Interim Consent Agreement in which Dr. Michalowski agreed to the temporary suspension of her license to practice medicine "prior to the Board's ultimate disposition of this new information regarding Dr. Michalowski's alleged self-prescribing of narcotic medication." *Id.* at 3. On February 5, 2010, the Board placed Dr. Michalowski on formal notice that it intended to hold the first session of the adjudicatory proceeding on April 13, 2010. *Defs.' Obj.* Attach. 3 *Notice of Adjudicatory Hearing regarding the summary suspension of your Maine medical license and the complaint of the Maine Board of Licensure in Medicine.*

---

administrative hearing on April 13, 2010, and the controversy between Dr. Michalowski and the Board has persisted for years. Yet, Dr. Michalowski waited until the Thursday before the scheduled completion of the hearing to file a motion for TRO. Cases where courts have denied equitable relief based on a plaintiff's delay have been more egregious than the facts in this case. *Allens Creek/Corbetts Glen Preservation Group, Inc. v. Caldera*, 88 F. Supp. 2d 77, 83-84 (W.D.N.Y. 2000), *aff'd* 242 F.3d 364 (2d Cir. 2001). Nevertheless, unwarranted delay in moving for injunctive relief "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (citation omitted).

## II. DISCUSSION

In assessing whether to grant a request for injunctive relief, a court is required to weigh a "familiar four-part test":

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and, (4) the effect (if any) of the court's ruling on the public interest.

*Iantosca v. Step Plan Servs.*, 604 F.3d 24, 29 n.5 (1st Cir. 2010) (citations omitted). To determine whether to issue a TRO, a court applies the same four-factor analysis used to evaluate a motion for preliminary injunction. *Northwest Bypass Group v. U. S. Army Corps of Eng'rs*, 453 F. Supp. 2d 333, 337 (D.N.H. 2006); *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 70 (D. Me. 1993).

### A. Likelihood of Success on the Merits: *Younger* Abstention

"The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996) (describing "likelihood of success" as the "main bearing wall of the four-factor framework"). The State Defendants persuasively contend that it is unlikely that Dr. Michalowski will be successful on the merits of her law suit in this Court because her claim is barred by the *Younger* abstention doctrine.

5

Named after the seminal 1971 case *Younger v. Harris*, the *Younger* abstention doctrine arises "from strong policies counseling against the exercise of . . . jurisdiction where particular kinds of state proceedings have already been commenced." *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 626 (1986). "In the absence of extraordinary circumstances, interests in comity and the respect for state processes demand that federal courts should abstain from interfering with ongoing state judicial proceedings." *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 143 (1st Cir. 2008) (*Esso II*). "Although initially applied to protect state criminal prosecutions against interference, the *Younger* doctrine has been extended to 'coercive' civil cases involving the state and to comparable state administrative proceedings that are quasi-judicial in character and implicate important state interests." *Maymo-Melendez v. Alvarez-Ramirez*, 364 F.3d 27, 31 (1st Cir. 2004).

*Younger* abstention is mandatory, not discretionary, *see Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 68 (1st Cir. 2005), when the federal lawsuit would interfere:

> (1) with an ongoing state judicial proceeding; (2) that implicates an important state interest; and (3) that provides an adequate opportunity for the federal plaintiff to advance his federal constitutional challenge.

*Rossi v. Gemma*, 489 F.3d 26, 34-35 (1st Cir. 2007). Abstention may be inappropriate only in certain "extraordinary circumstances":

> Extraordinary circumstances include those situations in which 'core constitutional valued are threatened during an ongoing state proceeding and there is a showing of irreparable harm that is both

6

great and immediate.' *Maymo-Melendez*, 364 F.3d at 37 (internal quotation marks omitted). Among those extraordinary circumstances are cases in which extreme bias completely renders a state adjudicator incompetent and inflicts irreparable harm upon the petitioner. (citations omitted).

*Esso II*, 522 F.3d at 143; *Christian Action Network v. State of Maine*, 679 F. Supp. 2d 140, (D. Me. 2010) (stating that "[e]xtraordinary circumstances include bad faith, harassment and extreme bias; great and immediate irreparable harm to core constitutional values").

### 1. Ongoing State Judicial Proceeding

Established by 5 M.R.S.A. § 12004-A(24), the Board "consists of 9 individuals who are residents of [the] State [of Maine], appointed by the Governor." 32 M.R.S.A. § 3263. The Board consists of three representatives of the public and six graduates of a legally chartered medical college or university who have been actively engaged in the practice of their profession in the state of Maine continuously for 5 years prior to appointment. *Id.* As with other occupational and professional regulatory boards, the "sole purpose" of the Board is "to protect the public health and welfare" by "ensuring that the public is served by competent and honest practitioners and . . . by examining, licensing, regulating and disciplining practitioners of those regulated professions." 10 M.R.S.A. § 8008.

The Board is statutorily authorized to "suspend or revoke a license" for the following grounds:

> Habitual substance abuse that has resulted or is foreseeably likely to result in the licensee performing services in a manner that endangers the health or safety of patients.

7

32 M.R.S.A. § 3282-A(2)(B).

> Prescribing narcotic . . . drugs listed as controlled substances by the Drug Enforcement Administration for other than accepted therapeutic purposes.

32 M.R.S.A. § 3282-A(2)(J). Maine law contemplates a graduating process, beginning with an informal conference with the licensee and culminating with a formal hearing. 32 M.R.S.A. § 3282-A(2).

If the Board concludes that "modification or nonrenewal of the license is in order, the [Board] shall hold an adjudicatory hearing in accordance with Title 5, chapter 375, subchapter 4." 32 M.R.S.A. § 3282-A(1)(C); *see* 5 M.R.S.A. § 10003. The Board's hearing is an "adjudicatory proceeding" under Maine's Administrative Procedures Act. 5 M.R.S.A. § 8002(1) (defining an "adjudicatory proceeding" as "any proceeding before an agency in which the legal rights, duties or privileges of specific persons are required by constitutional law or statute to be determined after an opportunity for hearing"). Maine law mandates that an adjudicatory hearing provide for a panoply of procedural and substantive rights. 5 M.R.S.A. § 9056(2) (right to present evidence and arguments on all issues, to call and cross-examine witnesses, to make oral cross-examination of any person present and testifying); 5 M.R.S.A. § 9057 (evidence is admitted if it is the kind of evidence upon reasonable persons are accustomed to rely in the conduct of serious affairs, all witnesses shall be sworn); 5 M.R.S.A. § 9059 (proceedings must be recorded); 5 M.R.S.A. § 9060 (parties may request the issuance of subpoenas to secure witnesses or documents); 5 M.R.S.A. § 9061 (a decision must be in writing and must contain findings of fact).

Finally an aggrieved party "shall be entitled to juridical review thereof in the Superior Court." 5 M.R.S.A. § 11001(2).

A state medical board's disciplinary proceeding falls within the meaning of an ongoing judicial proceeding for purposes of *Younger* abstention. *Gibson v. Berryhill*, 411 U.S. 564, 576-77 (1973) (stating that "it is apparent from *Geiger* [*v. Jenkins*, 401 U.S. 985 (1971)] that administrative proceedings looking toward the revocation of a license to practice medicine may in proper circumstances command the respect due court proceedings"); *Doe v. Connecticut Dep't of Health Servs.*, 75 F.3d 81, 85 (2d Cir. 1996); *Selkin v. State Bd. for Professional Medical Conduct*, 63 F. Supp. 2d 397, 402 (S.D.N.Y 1999) (stating that there is "clear precedent to support the conclusion that the concerns of comity and federalism expressed in *Younger* warrant abstention where state disciplinary proceedings contemplating the revocation of a physician's medical license are ongoing"). The First Circuit has applied the *Younger* abstention doctrine to appeals pending in state courts from decisions of state medical and psychology registration boards. *Bettencourt v. Bd. of Registration in Medicine*, 904 F.2d 772, 778 (1st Cir. 1990) (applying *Younger* to an appeal from the Massachusetts Board of Registration in Medicine pending in the Supreme Judicial Court of Massachusetts); *Coggeshall v. Mass. Bd. of Registration of Psychologists*, 604 F.3d 658 (1st Cir. 2010). As Dr. Michalowski has the right to appeal any decision of the Board to the state of Maine Superior and Supreme Courts, the principles would appear to apply with equal force to an earlier state administrative proceeding. Finally, *Younger* abstention has been held to apply to similar

9

professional disciplinary proceedings. *Middlesex County Ethic Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 437 (1982) (abstention warranted where lawyer sought to enjoin ongoing state disciplinary proceedings against him and where lawyer had right to appeal administrative decision to state courts). The Court concludes that the pending disciplinary proceeding before the Board of Licensure in Medicine is an ongoing state judicial proceeding for *Younger* abstention purposes.[3]

### 2. Important State Interest

In *Middlesex*, the United States Supreme Court recognized that the state of New Jersey had an "important state obligation to regulate persons who are authorized to practice law." *Middlesex*, 457 U.S. at 432-33. In *Bettencourt*, the First Circuit quickly concluded that the regulation of the practice of medicine is an important state interest. *Bettencourt*, 904 F.2d at 778 (stating that "the issues at stake -- involving the enforcement of proper standards of medical licensure -- obviously implicate important state interests"). The Court readily concludes that the Board of Licensure in Medicine's disciplinary proceeding against Dr. Michalowski implicates important state interests under *Younger*.

### 3. Adequate Opportunity

The Maine Administrative Procedures Act allows for judicial review of the Board's decision. 5 M.R.S.A. § 11001(2). As such, Dr. Michalowski has an adequate opportunity to raise federal constitutional challenges in state court judicial review. *Bettencourt*, 904 F.2d at 778; *see Ohio Civil Rights Comm'n*, 477 U.S. at 629 (stating

---

[3] *Bradley v. Board of Psychologists*, AP-09-2 (Me. Super. Ct., Ken. Cty., May 19, 2009) (Jabar, J.) demonstrates that state courts are capable of handling the legal arguments Dr. Michalowski has presented this Court.

that "it is sufficient under [*Middlesex*] that constitutional claims may be raised in state-court judicial review of the administrative proceeding"). The Court concludes that Dr. Michalowski has an adequate opportunity in state court to raise the issues that she is attempting to raise before this Court. *Mallinckrodt LLC v. Littell*, 616 F. Supp. 2d 128, 140 (D. Me. 2009).

    4.    **Bias**

As all three *Younger* abstention elements are satisfied, abstention is mandatory unless an exception applies. *Id.* at 140. In *Gibson*, the Supreme Court carved out an exception for *Younger* abstention when the state board was "incompetent by reason of bias." *Gibson*, 411 U.S. at 577. As the First Circuit has explained, however, the bias exception applies only in "extraordinary circumstances . . . in which extreme bias completely renders a state adjudicator incompetent and inflicts irreparable harm upon the petitioner." *Esso II*, 522 F.3d at 143. Further, the burden shifts to Dr. Michalowski to show that "extraordinary circumstances" in her case should lead the court not to abstain. *Christian Action*, 679 F. Supp. 2d at 148. In *Perez v. Ledesma*, the United States Supreme Court offered one example in the criminal context: "Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate." 401 U.S. 82, 85 (1971).

11

In an effort to demonstrate such bias, Dr. Michalowski points to the following: (1) Assistant Attorney General (AAG) Dennis Smith generally provides legal counsel to the Board, but assumed the role of prosecutor before the Board against Dr. Michalowski; (2) during the April 13, 2010 hearing, Dr. Dreher, a member of the Board, requested clarification about at least two legal issues from AAG Smith, who was prosecuting the case against Dr. Michalowski; (3) during the same hearing, Cheryl Clukey, another Board member, questioned Dr. Michalowski about differences between her testimony and the Board's investigator's notes, stating that the investigator was efficient, organized and kept impeccable notes, and implying that Dr. Michalowski was not credible; (4) when Dr. Michalowski's counsel objected to the Board investigator's testimony that certain prescriptions were narcotics, Dr. Nyberg, a Board member, called the objection ridiculous; and, (5) the Board's Executive Director Randall Manning, although a non-voting member of the Board, advised the Northern Maine Medical Center before the hearing that it is unlikely Dr. Michalowski will ever get her medical license back. *Mot. for TRO* at 8.

The Court concludes that these examples, taken separately or together, do not amount to the type of extreme structural or actual bias that would justify federal intervention in a pending state proceeding. Dr. Michalowski alleges structural bias because AAG Smith generally provides counsel to the same Board before whom he is now prosecuting Dr. Michalowski. However, as the Office of Attorney General is required by law to provide legal representation to state agencies, 5 M.R.S.A. § 191, the Maine Supreme Judicial Court has described the

12

role of state attorney general as "unique." *Superintendent of Ins. v. Attorney Gen.*, 558 A.2d 1197, 1202 (Me. 1989). Here, as AAG's role shifted from counsel to prosecutor, the Board ensured the fairness of the proceeding by hiring a separate attorney, James E. Smith, and charging him with the duties of a Hearing Officer. As Attorney James E. Smith informed the Board at the outset, he served "as the Board's attorney and legal advisor." *State Defs.' Obj.* Attach. 4 at 4:13-14 (*Tr. of Adjudicatory Hearing*). The Court is not convinced that with the introduction of an independent hearing officer, the continued participation of the Board's regular counsel as prosecutor constitutes structural bias or overcomes the presumption that state administrators are people "of conscience and intellectual discipline." *Mallinckrodt*, 616 F. Supp. 2d at 141-43 (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)); *Fisher v. Iowa Bd. of Optometry Exam'rs*, 510 N.W.2d 873, 877 (Iowa 1994) (describing a similar situation as "neither unlawful nor uncommon").

Dr. Michalowski asserts that Dr. Dreher, a Board member, made an inquiry to AAG Smith about a legal issue and contends that Dr. Dreher's question is evidence of actual bias. The Court disagrees. The transcript that Dr. Michalowski provided does not corroborate her allegations. At the very outset of the hearing, Dr. Dreher asked for clarification about an issue of law and prefaced his inquiry by saying that he did not "know if I can ask that of anybody here." *State Defs.' Obj.* Attach. 4 at 5:7-9 (*Tr. of Adjudicatory Hearing*). Hearing Officer Smith told him to ask the question and then "we'll see." *Id.* 5:10-11. Hearing Officer Smith, not AAG

Smith, was the one who responded. *Id.* 5:16-17. If it exists, the factual predicate for Dr. Michalowski's contention is not before the Court.

Regarding her complaint about Ms. Clukey, Dr. Michalowski attached to her motion an excerpt of four pages of her testimony before the Board at the April 13, 2010 hearing. Reviewing the transcript, the dialogue is dense, and the Court has the sense of walking into the middle of a conversation. The relevant portion of the except appears to begin with Ms. Clukey asking Dr. Michalowski about a Dr. Moore; Ms. Clukey says that Dr. Moore came to Dr. Michalowski and said "she was very uncomfortable with what she did and had asked you to self report yourself?" *Aff. of Dr. Ellen Michalowski* Attach. 2 at 3:21-25, 4:1 (*Tr. of Adjudicatory Hearing*) (Docket # 3) (*Michalowski Aff.*). Dr. Michalowski responds that she had already "talked to Dr. Wood at that time, and she had already reported to someone before I could even get - - before I even got home from South Carolina." *Id.* at 4:2-5. Ms. Clukey responds that "that's not what I read in here." *Id.* at 4:6. She explains:

> See this is in direct contradiction to what you have told us. And I picked - - I mean, my ears just perked right up that you had told her about the consent agreement, you told her about your history with the Board, but in reading this, that's not true. That she found out from another doctor.

*Id.* at 4:21-25; 5:1. Ms. Clukey goes on:

> My question is that you had stated to us that you - - that Dr. Moore was clear that you had communicated to her clearly about your history with us and that you - - the issue with the consent agreement. And I don't find it here, and Maria Macdonald who was the investigator who's always been very thorough . . . and efficient and organized and impeccable in her information that she interviews people for, is saying that Dr. Moore said that this did not happen?

14

*Id.* at 5:25, 6:1-10. Presumably referring to Ms. Macdonald's notes, Dr. Michalowski responded that the notes say that Dr. Moore called in a prescription for Percocet, which Dr. Michalowski explained would have been against the law. *Id.* at 6:11-17. Dr. Michalowski then pointed out that Dr. Moore had obtained a medical license in Maine without revealing that she had an addiction to alcohol, had been treated for it, and was under a consent agreement in the state of Georgia. *Id.* at 6:17-22. Dr. Michalowski explained that it was Dr. Moore's problems in Georgia that had initiated their conversation. *Id.* at 6:20-21. Dr. Michalowski further explained that the reason Dr. Moore may not have mentioned this fact to Ms. Macdonald, the Board investigator, was that she "was trying to protect herself." *Id.* at 7:4-5.

Maine law provides that the Board's hearings are not subject to the Maine Rules of Evidence; instead "evidence is admitted if it is the kind of evidence upon reasonable persons are accustomed to rely in the conduct of serious affairs." 5 M.R.S.A. § 9057. If an investigator's notes appear to be meticulous, it is reasonable to inquire whether the witness knows why the entry does not appear. As it turns out, Dr. Michalowski had an explanation for why Dr. Moore might not have told Ms. Macdonald that Dr. Michalowski had told her that she had made a report to the Board since the overall context of the Michalowski – Moore conversation included an allegation that Dr. Moore herself had an addiction problem and had not reported it to the Maine Board.

It appears that Ms. Macdonald's investigative notes were before the Board at the hearing, so Ms. Clukey's questions gave Dr. Michalowski an opportunity to

15

explain why the substance of a conversation that Dr. Michalowski had had with Dr. Moore did not appear in the investigator's notes. Dr. Michalowski offered an explanation. The Court is unsure why asking for and receiving an explanation displays bias.

Dr. Michalowski's real complaint is that Ms. Clukey seemed to support Ms. Macdonald's credibility as an investigator. It would, however, be strange if a Board member had not gained an impression of a Board investigator's credibility and competence.[4] To express confidence in the professionalism of an investigator is not to display bias against the witness. It is to put a point to the question to which Dr. Michalowski offered a rational explanation.

Dr. Michalowski's complaint about Dr. Nyberg is wholly unconvincing. During the testimony, a witness offered the opinion that certain medicines were narcotics. *Michalowski Aff.* Attach. 3 at 3:1-11 (*Tr. of Adjudicatory Hearing*). Dr. Michalowski's counsel objected on the ground that the witness had not been qualified to render such an opinion. *Id.* at 3:15-17. The Hearing Officer asked whether there was a dispute as to whether the two medications – Endocet and Percocet – were narcotics. *Id.* at 3:20-21. The ensuing exchange led Dr. Nyberg to comment "That's ridiculous." *Id.* at 4:7. As Hearing Officer Smith observed, "You've got a Board of doctors sitting here and I'm getting comments from them that . . . basically are saying they know Percocet and Endocet are narcotics." *Id.* at 4:10-14. Although counsel's objection on foundational grounds to a lay witness's

---

[4] Presumably, Ms. Clukey had an opinion of Ms. Macdonald's competence whether or not she voiced her impression.

16

testimony about the narcotic properties of a prescriptive drug may have been well taken before a jury, the Board of Licensure in Medicine is not comprised of lay people. By law, it is comprised of a certain number of physician members, and on April 13, 2010, the transcript reveals that four physicians were participating as Board Members. Quibbling about whether a lay witness had sufficient expertise to identify particular drugs as narcotics when the doctor members of the Board know from their own training and expertise whether the drugs were in fact narcotics could well be undiplomatically termed "ridiculous" from the perspectives of the physician and non-physician members.

The final assertion of bias is that Randall Manning, the Executive Director of the Board, told the Northern Maine Medical Center that Dr. Michalowski would probably never get her license back. *Michalowski Aff.* ¶ 39. Mr. Manning's statement sounds much worse that it is. Mr. Manning is a non-voting member of the Board, and he is not listed as a participating member of the Board at the April 13, 2010 hearing. As Executive Director, Mr. Manning is required to "assist the board in carrying out its administrative duties and responsibilities. . . ." 32 M.R.S.A. § 3269(16). As earlier noted, the "sole purpose" of the Board is "to protect the public health and welfare" by "ensuring that the public is served by competent and honest practitioners and . . . by examining, licensing, regulating and disciplining practitioners of those regulated professions." 10 M.R.S.A. § 8008.

It is reasonable to assume that the Northern Maine Medical Center has been properly concerned about whether Dr. Michalowski, a member of its medical staff,

17

was likely to return to practice OB/GYN in northern Maine; if not, the NMMC would have to address contingencies. Mr. Manning's statement to the Northern Maine Medical Center was his frank appraisal of the prospect of Dr. Michalowski's return to NMMC as a member of the medical staff. There is no evidence the Executive Director's prediction was motivated by bias against Dr. Michalowski and further there is no suggestion that Mr. Manning has any role in the pending disciplinary proceeding.

In sum, Dr. Michalowski's evidence of bias has not nearly risen to the level of bias that would justify application of an exception to the *Younger* abstention doctrine.[5]

The Court need go no further. It must abstain. Dr. Michalowski has failed to prove the *sine qua non* of her claim for a TRO, a likelihood of success on the merits. This alone is a sufficient ground to deny her motion for TRO. In excess of caution, however, the Court will briefly touch on the other criteria.

### B. Irreparable Harm

Dr. Michalowski's main claim of irreparable harm is that she will be denied due process in violation of the United States Constitution. *Mot. for TRO* at 15. However, Dr. Michalowski is free to raise constitutional issues before the Board. 5 M.R.S.A. § 9056(2) (stating that parties to adjudicatory proceedings have "the right

---

[5] The allegations of bias in Dr. Michalowski's case pale beside *Esso II*, where the First Circuit concluded that there was "a strong appearance of bias and, additionally, undisputed evidence of actual bias in these proceedings." *Esso II*, 552 F.3d at 148. In *Esso II*, the Puerto Rican Environmental Quality Board (EQB) voted to fine Esso $76 million for 550 gallons of spilled fuel. *Id.* at 140. The fine was to fund the EQB's budget from which the hearing officers were going to be paid. *Id.* at 146-47. Further the Puerto Rican Senate had threatened criminal prosecution of EQB officials for failure to timely respond to the spill. *Id.* at 147.

to present evidence and arguments on *all* issues") (emphasis supplied). If Dr. Michalowski receives an unfavorable ruling from the Board, she has the right to appeal the decision to the Superior court and, if necessary, to the Maine Supreme Judicial Court. 5 M.R.S.A. § 11001(1); 5 M.R.S.A. § 11008. The Superior and Supreme Courts are empowered to address Dr. Michalowski's federal claims. *Mallinckrodt*, 616 F. Supp. 2d at 140.

It is true that if the Board publicly disciplines Dr. Michalowski, her name and professional reputation will be severely harmed and perhaps irreparably so. However, it is also true, as Dr. Michalowski has complained, that the earlier consented-to actions affected her name and professional reputation, and therefore the damage, though significant, would be incremental. Further, it is always true that whenever the Board publicly disciplines a physician, there is a degree of irreparable damage to the doctor's name and reputation, but this alone cannot justify the issuance of an injunction.

This factor slightly favors Dr. Michalowski.

### C. Balance of Harms

Dr. Michalowski argues that there will be no harm to the State Defendants if the July 13, 2010 hearing is enjoined since she is not now practicing medicine. Although the State Defendants have said that the July 13, 2010 hearing has been difficult to schedule, the State Defendants' main point is that federal interference with an ongoing state administrative proceeding is itself "the exact sort of harm

19

that *Younger* abstention seeks to avoid." *State Defs.' Obj.* at 12. This factor slightly favors Dr. Michalowski.

### D. Public Interest

The Board's effort to protect the public by disciplinary proceedings against a physician with a history of drug addiction clearly favors the public interest. This factor strongly favors the State Defendants.

## III. CONCLUSION

The Court concludes that the *Younger* abstention elements have been clearly satisfied and abstention is mandatory. The Court also concludes that Dr. Michalowski failed to sustain her burden to establish that the "extraordinary circumstances" exception applies.

The Court DENIES Ellen Michalowski, M.D.'s Motion for Temporary Restraining Order (Docket # 4).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 12th day of July, 2010